**FIRST DIVISION**
**DOYLE, C. J.,**
**BOGGS and PETERSON, JJ.**

**NOTICE: Motions for reconsideration must be**
*physically received* **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 29, 2016**

# In the Court of Appeals of Georgia

A15A1811. JEFFERSON v. HOUSTON HOSPITALS, INC. d/b/a    BO-089
 PERRY HOSPITAL, et al.

A15A1812. JOHNSON v. HOUSTON HOSPITALS, INC. d/b/a    BO-090
 PERRY HOSPITAL, et al.

A15A2022. LUMPKIN v. HOUSTON HOSPITALS, INC. d/b/a    BO-027
 PERRY HOSPITAL, et al.

BOGGS, Judge.

These three cases arise out of the misconduct of an employee of Perry Hospital, who forged mammography reports instead of giving the images to a radiologist for review. Patricia Jefferson, Catherine Johnson, and Gaynelle Lumpkin ("appellants") received falsified reports stating that their mammograms were normal. After learning of the employee's misconduct, appellants brought identical claims against Houston Hospitals, Inc. and Houston Healthcare Complex MSO, Inc., d/b/a Perry Hospital, and the Hospital Authority of Houston County (collectively, "the Hospital"), as well

as the employee, several physicians and practices, and a "John Doe" defendant. The trial court granted the Hospital's motions for summary judgment, and appellants appeal. Because appellants have not presented sufficient evidence to sustain their claims under any asserted cause of action, we affirm the judgments of the trial court.[1]

"Summary judgment is appropriate when no genuine issues of material fact remain and the movant is entitled to judgment as a matter of law. On appeal, we review the grant or denial of summary judgment de novo, construing the evidence and all inferences in a light most favorable to the nonmoving party." (Citation and punctuation omitted.) *Seki v. Groupon, Inc.*, 333 Ga. App. 319 (775 SE2d 776) (2015). So viewed, the record shows that all three appellants received routine mammograms at the Hospital in early 2009. In each case, the mammograms were performed by Rachael Repraeger, the "lead mammography technologist" at the Hospital. As part of her duties, Repraeger helped train "locum tenens" – temporary or visiting radiologists – in the use of the Hospital's computer-based mammography record system. She testified that, as a result, she knew "several" of their passwords. She added that, because the visiting physicians "had a lot on their plate," her

---

[1]The three appellants are all represented by the same attorney, and appellants' pleadings and affidavits in the trial court are almost identical, as are their appellate briefs. We therefore address all three appeals together.

supervisor told them to use their last names as a password, so "when they got stuck or when I would have to show them how to use [the system] for the first few times, I would know their password." The system was accessible only from two computer terminals, one in the mammogram room and the other in the radiologists' reading room.

Although Repraeger was supposed to transmit the mammogram images to a radiologist for interpretation, she testified that instead she used passwords she learned through her training duties to enter the Hospital's mammography record system and created forged reports indicating that the mammograms were normal. Repraeger testified that she knew that what she was doing was outside the scope of her duties, that she "knew it was wrong," and that she told no one what she was doing. Her superiors testified that neither they nor Repraegers' coworkers in a "small . . . close knit department" knew that she was forging reports.

In early April of 2010, the Hospital discovered anomalies during a patient peer review and began an investigation. During that investigation, Repraeger acknowledged that she had entered numerous forged reports showing negative mammogram results, despite the images never having been reviewed by a radiologist. As a result, Repraeger was terminated on April 6, 2010. She also was indicted on ten

3

counts of reckless conduct and ten counts of computer forgery. She pled guilty to ten counts of reckless conduct and one count of computer forgery and was sentenced to 160-180 days of confinement in a detention center and 10 years of probation, and was prohibited from holding a job in healthcare.

Shortly after Repraeger's fraud was discovered, the Hospital contacted appellants by telephone asking that they return for another mammogram; appellants allege that the Hospital told them only that it was testing a new machine and did not reveal Repraeger's misconduct. On May 10, 2010, the Hospital issued a press release disclosing that "a radiology employee had processed a number of mammography tests done in 2009 and early 2010 without obtaining a reading of the tests by a Radiologist," apologizing, and detailing its efforts to remedy the situation. At least one appellant also received a follow-up letter from the Hospital in June of 2010, stating that it had no record of her returning for a mammogram in 2010, and that it had "discovered a breach in our quality control process that may have affected the reliability of the interpretation of your mammogram study. As we can draw no conclusions about the results from your previous study, **it is absolutely critical you schedule a repeat mammogram in the very near future**." (Emphasis in original.)

4

All three appellants received a mammogram in April or May of 2010, and all three mammograms were normal and showed no abnormalities or signs of breast cancer. Appellants acknowledge that they do not have and have never had breast cancer.

Appellants brought these actions on May 31, 2012, asserting identical claims for fraud, RICO, intentional infliction of emotional distress, breach of contract and express warranty, general negligence, negligence per se, and conversion. They also sought bad faith penalties, attorney fees, and punitive damages. After extensive discovery and briefing, the trial court granted summary judgment in favor of the Hospital in three virtually identical but lengthy, thoughtful and comprehensive orders, addressing each of appellants' claims in detail. From these orders, appellants appeal, asserting as their sole enumeration of error that the trial court erred in granting the Hospital's motions for summary judgment.

The trial court determined that the Hospital was not vicariously liable for Repraeger's actions because she did not act within the scope of her employment. It also determined that appellants had failed to show intentional infliction of emotional distress. Finally, it held: "Damages are an essential element of all causes of action alleged by Plaintiff[s]. As a matter of law, the evidence presented as to the alleged

5

damages suffered by Plaintiff, under each cause of action claimed, is insufficient to submit to a jury." We agree with the trial court that vicarious liability does not arise here, that appellants have not shown intentional infliction of emotional distress, and that they have failed to show any actionable damages under any cause of action asserted.

1. Appellants first contend that the Hospital is responsible for the actions of Repraeger under a theory of vicarious liability.

> This matter is generally governed by OCGA § 51-2-2, which provides that a master is liable for the torts committed by his servant in the prosecution and within the scope of his business, whether the same are committed by negligence or voluntarily. The question is not whether the master authorized the servant to commit the tort, but whether the servant was authorized to accomplish a purpose in pursuance of which a wilful tort is committed. The test is whether the tort was done within the scope of the actual transaction of the master's business for accomplishing the ends of his employment. Whether a servant is acting within the scope of his employment is usually a jury question, but may be decided by the court as a matter of law in plain and palpable cases. This is such a case.

(Citations, punctuation, and footnotes omitted.) *Rent to Own, Inc. v. Bragg*, 248 Ga. App. 130, 131 (1) (546 SE2d 9) (2001). In *Bragg*, a store manager was directed by a company vice-president to swear out a warrant for the arrest of an individual who

6

failed to pay for rental appliances. However, he named the wrong person in the affidavit; that individual was arrested and then sued the company for malicious prosecution. We held that, in the absence of evidence that the manager acted for personal reasons, it was undisputed that he "was acting within the scope of the actual transaction of Rent to Own's business for accomplishing the ends of his employment." (Citations, punctuation, and footnote omitted.) Id. at 132 (1).

Here, in contrast, the undisputed evidence shows that Repraeger was not acting within the scope of her employment when she improperly accessed the mammography computer files and forged reports. She testified that it was not part of her duties to read and interpret the mammogram films, and that she did so not in furtherance of the Hospital's business, but because she had become "really careless and lazy for lack of a better word," instead of transmitting the films promptly to the radiologists, she allowed her work to get "so backed up" that she "would just go into the computer like the doctor would do" and create fraudulent reports.

Our Supreme Court has addressed the issue of a hospital's vicarious liability for the acts of an employee in *Piedmont Hosp. v. Palladino*, 276 Ga. 612 (580 SE2d 215) (2003). There, a nurse was authorized to provide post-surgical treatment to a patient, including the inspection and cleaning of the patient's genital area. But

7

evidence was presented that the nurse, while providing this treatment, sexually molested the patient. Id. at 613. The court observed:

> Two elements must be present to render a master liable under respondeat superior: first, the servant must be in furtherance of the master's business; and, second, he must be acting within the scope of his master's business. If a tort is committed by an employee not by reason of the employment, but because of matters disconnected therewith, the employer is not liable. If a tortious act is committed not in furtherance of the employer's business, but rather for *purely personal reasons* disconnected from the authorized business of the master, the master is not liable.

(Citations, punctuation, and footnotes omitted; emphasis in original.) Id. at 613-614. The Supreme Court, reversing this court, found that the hospital could not be held vicariously liable. Id. Once the nurse deviated from his job duties, "he was no longer acting within the scope of his employment or furthering the business of [the] hospital. At that point, [the nurse] was acting not as a hospital employee, but rather purely for his own personal reasons." (Citation, punctuation, and footnote omitted.) Id. at 614. The Supreme Court rejected the idea that a mere physical connection or association between the employee's authorized duties and the wrongful act could create vicarious liability. It held that when the nurse "abandoned the hospital's interest and began

pursuing his own personal, morally offensive, agenda . . . . his actions extended beyond the scope of his employment and were totally unconnected to the Hospital's business." Id. at 615. Moreover, the fact that his employment provided the "opportunity to commit tortious acts" by placing him alone in a room with an unconscious or sedated patient did not create vicarious liability. Id. In so holding, the Supreme Court cited *Lucas v. Hosp. Auth.*, 193 Ga. App. 595 (388 SE2d 871) (1989). *Palladino*, supra, 276 Ga. at 615. In *Lucas*, this court found that summary judgment was proper when a nurse administered lethal doses of medication to patients "in order to 'put them out of their misery'." 193 Ga. App. at 595 (1). "While [the nurse] may have been advancing the hospital's interests in giving *authorized* injections of potassium chloride, she clearly abandoned the hospital's interest and pursued only her own when she gave the lethal, unauthorized injections. [Cit.]" (Emphasis in original.) Id.

Similarly, even if Repraeger had access to doctors' passwords as part of her training duties, her illicit use of them was not within the scope of her employment, as appellants contend. When she stepped aside from her job duties and indeed violated them by forging documents for her own personal convenience, her "actions took [her] outside the realm of employment and became purely personal in nature."

9

276 Ga. at 616. Moreover, her actions did not "further[] the employer's business." Id. By undertaking responsibilities that she was not charged with or qualified to perform, Repraeger abandoned the Hospital's business to serve her own convenience, "not for any purpose beneficial to" the Hospital. (Citation omitted.) *Dowdell v. Krystal Co.*, 291 Ga. App. 469, 471 (1) (662 SE2d 150) (2008) (cashier trained to refer customer complaints to manager and had no responsibility to resolve them; fighting with complaining customer not for any purpose beneficial to employer; cashier abandoned employer's business.)

The cases cited by appellants provide no grounds for holding that Repraeger's improper and indeed criminal acts were within the scope of her employment or in furtherance of the hospital's business. In *Gann v. Mills*, 124 Ga. App. 238 (183 SE2d 523) (1971), an apartment manager instructed a maintenance worker to remove clothing that was left in a common laundry room on the premises. The maintenance worker did so, but apparently disposed of the clothing. This court affirmed the denial of the apartment owners' motion for summary judgment, but not for the reason that the worker's act was within the scope of his employment. Rather, we held that in the absence of admissible testimony concerning the scope of the duties of the maintenance worker, "the defendants have failed to pierce the allegations" of the

10

plaintiff's complaint. Id. at 240. Similarly, *May v. Crane Bros., Inc.*, 276 Ga. 280 (576 SE2d 286) (2003), does not support appellants' position. That decision addresses only the issue of punitive damages after a jury had already found an employer liable on the basis of respondeat superior. Neither *May* nor its earlier appearance in this court, *Crane Bros., Inc. v. May*, 252 Ga. App. 690 (556 SE2d 865) (2001), addresses the jury's earlier verdict that the employer was liable under a theory of respondeat superior.

The trial court did not err in granting summary judgment on the issue of vicarious liability.

2. Appellants next argue that the trial court erred in granting summary judgment on their claims for intentional infliction of emotional distress. This tort has four elements, all of which must be shown to prevail.

> To recover on an intentional infliction of emotional distress claim, a plaintiff must show evidence that: (1) defendants' conduct was intentional or reckless; (2) defendants' conduct was extreme and outrageous; (3) a causal connection existed between the wrongful conduct and the emotional distress; and (4) the emotional harm was severe. The evidence in this case does not show either extreme and outrageous conduct or severe emotional harm. It [is] not . . . enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his

11

conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been extreme and outrageous.

(Citations, footnotes, and punctuation omitted.) *Abdul-Malik v. AirTran Airways*, 297 Ga. App. 852, 855-856 (1) (678 SE2d 555) (2009). Under the second element,

[e]xtreme and outrageous conduct is that which is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Whether actions rise to the level of extreme and outrageous conduct necessary to support a claim of intentional infliction of emotional distress is generally a question of law.

(Citations, punctuation, and footnotes omitted.) Id. at 856 (1). And under the fourth element, "[t]he law intervenes only where the distress inflicted is so severe that no reasonable person could be expected to endure it. Whether severe emotional distress can be found, based on the evidence presented, is a question for the court to decide." (Citations, punctuation, and footnotes omitted.) Id. at 858 (1).

As in *Abdul-Malik*, here the evidence fails to show "either extreme and outrageous conduct or severe emotional harm." Id. Appellants argue that the Hospital was reckless in its supervision of Repraeger and intentionally concealed the reason

12

for the necessity of a repeat mammogram in its initial telephone calls. But any such conduct by appellees is irrelevant to our analysis, because appellants' case fails on the second and fourth elements of the cause of action. Appellants also conflate the conduct of Repraeger and that of the Hospital in arguing that the Hospital's acts were extreme and outrageous. But, as noted in Division 1, supra, the Hospital is not liable in respondeat superior when the employee's actions were outside the scope of her employment and not in furtherance of the Hospital's business. Therefore, as appellants acknowledge, under this circumstance the claims here are without merit.

Nor have appellants provided evidence that the distress they suffered was "so severe that no reasonable person could be expected to endure it." One appellant testified in her deposition that she was "disgusted" and "ha[d] anxiety" about appellees' conduct. The second testified that "[i]t really upset me at the time," "for a short time," but she "[doesn't] dwell on it." The third appellant testified that she was "[e]motional . . . really upset." But all three appellants testified that they have not sought medical treatment or counseling for any emotional distress. Two complained of transient sleeplessness, but none of the appellants enumerate any specific psychological symptoms, and certainly not any symptoms rising to the level of "severe." Even such physical manifestations as sleeplessness, anxiety, and headaches,

standing alone, are not "so severe that no reasonable person could be expected to endure them." (Citations and footnote omitted.) *Abdul-Malik*, supra, 297 Ga. App. at 858 (1). See also *Jones v. Warner*, 301 Ga. App. 39, 43 (3) (686 SE2d 835) (2009) ("anxiety, nervousness, sleeplessness, and irritability," with no medical or psychiatric treatment sought, not sufficiently severe.)

Appellants rely on *Sevcech v. Ingles Markets*, 222 Ga. App. 221, 223-224 (3) (474 SE2d 4) (1996), to argue that they need show no evidence of medical treatment. However, in *Abdul-Malik*, supra, we expressly distinguished *Sevcech*. 297 Ga. App. at 858 n. 20 (1). In that case the appellant was falsely accused of shoplifting by three employees, who took him to the store office, forced him to submit to a body search, knocked him to the ground, and then called the police and had him arrested. While it is true that evidence of medical treatment is not required to establish the existence of severe emotional distress, it is a factor that is considered in determining the severity of that distress. But here, appellants cannot show from all of the evidence, which includes the fact that they obtained no medical treatment, that their distress was "so severe that no reasonable person could be expected to endure it." (Citations, punctuation, and footnote omitted.) Id. at 858.

14

The trial court did not err in granting summary judgment on appellants' claims of intentional infliction of emotional distress.

3. We next address appellants' contention that the trial court erred in finding that they had failed to show damages with respect to their remaining claims.

(a) First, appellants cannot demonstrate any physical injury attributable to the Hospital's conduct. Most significantly, none of the appellants have or have had breast cancer, and therefore the failure of a radiologist to examine their mammography films did not exacerbate an existing condition. This distinguishes their situation from those in which an improper or negligent examination resulted in a delayed diagnosis and treatment of a disease.

Appellants argue that the 2010 mammography procedures involved "additional harmful radiation" and that during that procedure their breasts were "squeezed, pushed, and physically manipulated by [the Hospital's] staff for the repeat mammogram[s]." But all appellants regularly obtained a mammogram on an annual basis, and they would have been due for annual mammograms on or about the time the "repeat mammograms" were performed. Even if we assume that an ordinary medical diagnostic procedure by which the Hospital attempted to cure an employee's misconduct could be construed as an injury, appellants have failed to show that the

15

physical contact, to which they consented, would not have occurred in any event at the time of their regularly scheduled mammograms.

(b) Appellants also contend that they suffered monetary damages, because their health insurance was billed for the unread mammograms and was not reimbursed for two years. But the Hospital reimbursed appellants' health insurers for the cost of the 2009 mammograms, and did not bill them for the 2010 mammograms.

(c) In the absence of physical injury or pecuniary loss, appellants cannot show damages for emotional distress. "If 'mental pain and suffering' is not accompanied by physical injury or pecuniary loss, recovery is allowed only if the conduct complained of was 'malicious, wilful, or wanton.'" (Citations and punctuation omitted.) *Ryckeley v. Callaway*, 261 Ga. 828, 829 (412 SE2d 826) (1992). Since we have found in Division 1 that the Hospital is not vicariously liable for the conduct of Repraeger, appellants have failed to show such conduct on the part of the Hospital.

Moreover, as noted above, appellants have never been diagnosed with breast cancer, and any emotional distress attributable to mistrust of the mammogram procedure or fear of a misdiagnosis in the future is not cognizable in damages.

It is axiomatic that for recovery, there must be some reasonable connection between the act or omission of a defendant and the damages

16

which a plaintiff has suffered. Without factual evidence of a causal connection between the alleged breach of duty and the purported damages, the damages must be considered whimsical, fanciful and above all too speculative to form the basis of recovery under OCGA § 51-12-8. As in any negligence case, the [plaintiffs] had to show both cause in fact and legal cause. . . .

(Citation omitted.) *Russaw v. Martin*, 221 Ga. App. 683, 686 (1) (472 SE2d 508) (1996). In *Russaw*, a hospital patient incurred an accidental needle stick from a needle that had been used to administer another patient's medication. The patient and her husband asserted damages for emotional injuries and mental anguish due to their fears that she had been exposed to hepatitis or AIDS, despite multiple tests over several months with negative results for the patient, her husband, and the other patient. Id. at 684. Even with an actual physical injury from the needle stick, we held that, because the plaintiffs "offered no evidence of actual exposure to HIV or AIDS or hepatitis and no evidence of a channel of communication of disease, we hold that their recovery for fear and mental anguish is per se unreasonable as a matter of law." Id. at 687 (1). In so holding, we specifically rejected the "window of anxiety" approach to emotional injuries during the "time lag" between the allegedly harmful event and the receipt of definitive negative test results. Id. at 685-686 (1). See also

17

*Johnson v. American Nat. Red Cross*, 276 Ga. 270, 272-273 (1) (578 SE2d 106) (2003) (merely theoretical exposure to undetectable strain of HIV through blood transfusion insufficient to support claim for damages.)

(d) In the absence of any cognizable physical, pecuniary, or emotional injury, the trial court properly granted summary judgment on appellants' RICO claims. See, e.g., *Schoenbaum Ltd. v. Lenox Pines, LLC*, 262 Ga. App. 457, 470 (8) (c) (585 SE2d 643) (2003) (private RICO plaintiff "must show that one of the predicate acts directly harmed it, not a third party." (Citations, punctuation, and footnote omitted); *Sevcech, supra*, 222 Ga. App. at 221-222 (1) (RICO requires "motive or effect . . . to derive pecuniary gain.")

(e) Similarly, based upon their failure to show damages, the trial court properly granted summary judgment on appellants' negligence and breach of contract claims against the Hospital based on its own conduct.

(f) Finally, appellants' "derivative claims of attorney fees and punitive damages will not lie in the absence of a finding of compensatory damages on an underlying claim. [Cit.]" *D. G. Jenkins Homes, Inc. v. Wood*, 261 Ga. App. 322, 325 (3) (582 SE2d 478) (2003).

*Judgments affirmed. Doyle, C. J. and Peterson, J., concur.*

18